## THE WESTERN WAVE (two cases).

## THE TEXAN (formerly the Western Wave).
### Nos. 21044, 25, and 20.

District Court, E. D. Louisiana.
March 13, 1934.

Harold A. Moise, of New Orleans, La., and Philip S. Pugh, of Crowley, La., for libelant Board of Com'rs of Port of New Orleans.

Monroe & Lemann and Nicholas Callan, all of New Orleans, La., for libelant Johnson Iron Works, Dry Dock & Shipbuilding Co., Inc.

Montgomery & Montgomery and H. F. Stiles, Jr., all of New Orleans, La., for owner and claimant, North American Fruit & S. S. Co.

BORAH, District Judge.

These three suits were consolidated for the purpose of trial, and accordingly may be disposed of in one opinion.

On January 23, 1932, and June 23, 1932, the Board of Commissioners of the Port of New Orleans filed separate libels against the steamship Western Wave and the steamship Texan (formerly the Western Wave) asserting claims due it for dockage, sheddage, etc., and on June 6, 1932, the Johnson Iron Works, Dry Dock & Shipbuilding Company, Inc., filed a libel against the Western Wave to re-

cover for repairs furnished to the vessel while in the port of New Orleans. The vessel was seized in each instance and claimed by the North American Fruit & Steamship Corporation as owner. The owner answered the libels and denied that any maritime liens existed on the vessel, on the ground that at the time these claims arose the vessel was being operated under a charter by the New Orleans, Houston & Corpus Christi Steamship Company, Inc., and that under the terms thereof it was stipulated that the charterer was to pay all port charges, etc., and that neither the charterer nor the master had any right to permit a lien to be imposed upon the vessel except for crew's wages and salvage. As a further ground of defense it is urged that libelants in contracting for said wharfage and repairs dealt solely with the New Orleans, Houston & Corpus Christi Steamship Company, Inc., or its representatives, and relied fully on the faith and credit of said company. The owner also filed a cross-libel against the libelant in the above suit bearing Docket No. 20 for the damages which it claims to have suffered because of the alleged wrongful and unwarranted seizure of the Texan, which was then under charter to the Gulf Steamship Line, Inc.

While the separate libels of the Board of Commissioners of the Port of New Orleans may be treated as one claim because the principles of law which govern them and the facts under which they arose are identical, it will be necessary to deal with the Johnson Dry Dock & Shipbuilding Company, Inc., claim separately because of the differences in principle involved. However, there are certain facts which are applicable to both claims and they will first be briefly stated.

The Western Wave is owned by the North American Fruit & Steamship Corporation, a Delaware corporation, and prior to the period in controversy she had been laid up at Walnut street in the harbor of New Orleans. On March 28, 1931, the owner entered into a bare boat charter for the vessel with the New Orleans, Houston & Corpus Christi Steamship Company, Inc., a Louisiana corporation, with its principal place of business in the city of New Orleans, under the terms of which, in so far as material, the charterer agreed (1) to pay all port charges, (2) stipulated that neither the charterer nor the master had any right to permit a lien to be imposed upon the vessel except for crew's wages and salvage, (3) obligated itself to notify in writing if practicable any person furnishing repairs to the steamer of these limitations which the charter party placed upon its au-

thority and that of the master, and (4) further agreed to fasten to the steamer in a conspicuous place, and to maintain during the life of this charter, a notice reading as follows: "This steamer is the property of the North American Fruit & Steamship Corporation. It is under charter to New Orleans, Houston & Corpus Christi Steamship Company, Inc., and by the terms of the Charter neither the Charterer nor the Master has any right, power, or authority to create, incur, or permit to be imposed upon the steamer any liens whatsoever except for crew's wages and salvage."

In compliance with the last-stated condition and with the knowledge of the representative of the owner who was likewise the auditor of the charterer, there was posted on the vessel on April 30, 1931, in the passageway leading into the saloon, in the smoking room, in the pilot house and, in the crew's messroom, notices reading as prescribed. The testimony, however, is all one way that these notices were not observed by the libelants or their representatives, and the probabilities all favor the view that the contrary was not intended; otherwise it is reasonable to assume that the owner's representative would have required the posting of a notice in the engine room where he knew essential repairs had to be made before the vessel would be in condition to earn the contemplated charter hire. The other remaining facts which are deemed material will be stated in connection with the claims to which they apply.

### Claim of the Board of Commissioners of the Port of New Orleans.

The Board of Commissioners of the Port of New Orleans is an agency of the state of Louisiana and was created by Act No. 70 of 1896, as amended by Act No. 36 of 1900 and Act No. 14, Extra Session of 1915. The Board is vested by law with complete jurisdiction of the public wharves and landings of the port of New Orleans, and is empowered to charge for the use of the wharves, sheds, and other structures and for the use of all facilities administered by it such fees, rates, tariffs, and other charges as may be established by the Board.

Acting under the above statutes, the Board adopted and published a tariff in which there appears under the definition "Dockage-Wharfage" the following: "A charge against vessels for the use of the public wharves or mooring facilities based upon the gross tonnage of the vessel. The ship is responsible for this charge." Under the definition "Sheddage" appears the following: "A

charge against vessels for the use of covered wharves based upon the gross tonnage of the vessel. This charge is in addition to the Dockage-Wharfage Charge. The ship is responsible for this charge." Under the definition "Wharf Tollage" appears the following: "A charge against vessels based on tons of cargo received or discharged while lying at public wharves or mooring facilities. The ship is responsible for this charge."

The proof shows that the services were rendered to the ship and upon the credit of the ship, and as there is no contest as to the amount of the charges or the correctness thereof, there remains for determination the question of the lien and the extent to which it may be affected by the existing charter party. This precise question was presented in the case of The Palnatoke, which bears docket Nos. 17, 164–65–67 of this court, and the same defense was made then as is interposed in the case at bar. In disposing of this contention, Judge Burns in considering the provisions of the Maritime Lien Act of 1910 relating to liens for necessaries as re-enacted in the Ship Mortgage Act of 1920, § 30, subsecs. P–S (U. S. C., tit. 46, §§ 971–974 [46 USCA §§ 971–974]) said: "Pilotage, wharfage, etc., are not included in the terms 'other necessaries', which has been construed to refer only to things ejusdem generis with 'repairs, supplies, towage, dry dockage or marine railway.' Like seamen's wages, salvage services, and others, they, by the general maritime law, are beyond and above the Act and give rise to a lien ipso facto, since the admiralty law presumes they are rendered on the credit of the vessel to whose movement as an instrument of commerce they are essential necessaries." See, also, Ex parte Easton, 95 U. S. 68, 75, 24 L. Ed. 373, and the following decisions from this circuit: The Dictator (D. C.) 18 F.(2d) 131; The Rathlin Head (D. C.) 292 F. 867; Id. (C. C. A.) 299 F. 474; The El Amigo (C. C. A.) 285 F. 868.

In Ex parte Easton, supra, the court upon making the observation that wharves, piers, or landing places were as essential to commerce as ships and vessels, stated: " * * * that the contract for wharfage is a maritime contract, for which, if the vessel or watercraft is a foreign one, or belongs to a port of a State other than that where the wharf is situated, a maritime lien arises against the ship or vessel in favor of the proprietor of the wharf." Applying this language to the facts in the instant case, the conclusion is inescapable that libelant's claim to a lien under the general maritime law has been established, as the evidence shows that the West-

ern Wave was owned by a Delaware corporation and consequently she was not in her home port while in New Orleans, even if it be assumed that she was there enrolled (and the record is silent with reference thereto). The Havana (C. C. A.) 64 F. 496. Indeed, it is held in the Second Circuit that such a lien arises in the "home" port as well. The Scow No. 15 (C. C. A.) 92 F. 1008; The Poznan (D. C.) 297 F. 345.

Claim of the Johnson Iron Works, Dry Dock & Shipbuilding Company, Incorporated.

[2] With regard to this claim it is conceded that the repairs were furnished in a workmanlike manner and that the amount charged was reasonable. The sole issue presented is whether or not the libelant has a lien upon the vessel for the repairs furnished. In addition to the facts previously stated, it appears that negotiations for the repairs were conducted by J. C. Proctor, the vice president and general manager of the New Orleans, Houston & Corpus Christi Steamship Company, Inc., and that all of his dealings were had with Neal Armstrong, the general superintendent of the Johnson Dry Dock & Shipbuilding Company, Inc. It is therefore quite clear that the libelant, according to the provisions of section 30, subsec. Q, of the Act of June 5, 1920 (46 USCA § 972), dealt with a person who presumably had authority from the owner to procure repairs, supplies, and other necessaries for the vessel. Indeed, claimant admits that a charterer by demise of the ship, sometimes called a bare boat charter, is an owner pro hac vice and that such persons having possession of the vessel and charge of her operation are persons to whom her management at the port of supply is intrusted. It follows that libelant has a lien upon the vessel for the repairs furnished unless, under the provisions of section 30, subsec. R, of the act just cited (46 USCA § 973), it knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of the charter party the person ordering the repairs was without authority to bind the vessel therefor. There is no convincing evidence here which could lead one to believe that at or prior to the time of furnishing repairs libelant knew, or by the exercise of reasonable diligence could have ascertained, the existence of the charter party or that the person ordering the repairs was without authority to bind the vessel therefor. On the contrary, the evidence shows that J. C. Proctor, the person having apparent authority to bind the vessel, made oral representations to Neal Armstrong of the Johnson Iron Works, Dry Dock & Shipbuilding

Company, Inc., that they (meaning either J. C. Proctor and his brother or the chartering company) had purchased the vessel and were in fact the owners thereof at the time the contract for repairs was made. Having in mind that these negotiations were carried on between parties who had an acquaintanceship of thirty-five years' standing, and considering the fact that during these negotiations overtures were made to Armstrong to take stock in this new company, it follows that he was led to believe that the representations made as to the ownership of the vessel were in fact true. Armstrong was further fortified in the belief that the representations made to him as to the ownership of the vessel were true because of a published article which he had previously observed in the Times-Picayune, a local paper of large circulation, which contained an announcement by J. C. Proctor, secretary-treasurer of the New Orleans, Houston & Corpus Christi Steamship Company, Inc., that the newly organized company had purchased the steamer Western Wave and would inaugurate weekly sailings between New Orleans and Texas ports. It is true that the authorship of this article was denied, but the fact remains that no public retraction was made thereof though both the Proctors knew of the publication of said article and likewise knew, or should have known, that it was calculated to cause supply men of the vessel to alter their position to their prejudice. Furthermore, the local representative of the claimant and owner positively knew at or about the time of the publication of said article that negotiations were being conducted by the charterer for the repair of the vessel with the Johnson Iron Works Dry Dock & Shipbuilding Company, Inc., and yet he never apprised them who was the owner of the vessel or informed them of the terms of the charter party because, to use his own language, "they never asked him." Nor does he in any manner seek to justify his silence and inaction, and it cannot be condoned in the absence of a showing that he had received some assurance from the charterer that he had given to the furnisher of repairs the required notice in writing or otherwise.

There is no creditable evidence in this record tending to prove that libelant ever knew, or from any accessible source of information could have learned, of the existence of the charter party or that the ownership of the vessel was other than it appeared and was claimed to be. But the claimant contends that regardless of how the court views the veracity of the witnesses in regard to the representations made as to the ownership of the vessel that it is immaterial to the case because the testimony shows that the work was done on the personal credit of the Proctors. I do not agree with this contention. In the first place, the statute declares that any person who furnishes repairs to a vessel shall have a maritime lien thereon and it shall not be necessary to allege or prove that credit was given to the vessel. That lien exists unless the proctors were wrongfully or unlawfully in possession of the vessel (and this is not claimed), or unless it is affirmatively shown to have been waived by the libelant and by an understanding between the parties that no such lien was contemplated. There is no evidence of any such understanding. On the contrary, it is very clear to me that libelant in making this contract intended to rely on the security of the vessel itself.

Upon the whole the conclusion is warranted that the libelant has met every requirement of reasonable diligence, and the lien will be allowed and the cross-libel will be dismissed.

It is ordered that decrees be entered in favor of the several libelants for the amounts claimed in their several libels and that their proctors may prepare and present decrees accordingly.